# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **BRIAN E. TAYLOR** | * | **CIVIL ACTION NO. 13-1158** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Brian E. Taylor, born February 2, 1963, filed applications for a period of disability, disability insurance benefits and supplemental security income payments on September 23, 2010, alleging disability as of September 21, 2009, due to a thoracic 7 and 8 ball injury, xyphoid process damage, numbness radiating from the tailbone to the legs, inability to sit or stand for more than 15 minutes at a time, left shoulder locking, peripheral spasm of the shoulder blades, daily headaches, difficulty squatting, and left hip injury with nerve damage resulting in the inability to lift 10 pounds.

FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dr. Michel Heard dated to October 2, 2009 to October 13, 2010**.  On October 13, 2009, claimant complained of back, tailbone and left hip pain and headaches after a folding chair collapsed under him at work on September 21, 2009.  (Tr. 266).  X-rays of the thoracic spine, lumbar spine, pelvis and sacroiliac joints, coccyx and hip were normal.  (Tr. 267).  Dr. Heard's impression was mid-back, low back, tailbone and left hip pain, headaches, and probable contusions and strains.  He recommended physical therapy and prescribed, Ultram, Mobic, and Zanaflex.

A CT scan of the lumbar spine dated October 2, 2009, showed minimal concentric disk bulges causing no canal stenosis or neural foraminal impingement.

2

(Tr. 272).  Claimant asked for a cane at his visit on October 26, 2009.  (Tr. 265).

An MRI of the lumbar spine taken on November 18, 2009, showed minimal disc dessication at L3-4 with no disc protrusion, spinal stenosis or impingement on the neural foramina and no nerve root entrapment or displacement.  (Tr. 271).  A thoracic MRI showed minimal disc bulge at T7-8 with no cord compression or displacement.

On November 24, 2009, Dr. Heard stated that the thoracic MRI showed a small bulge without neurocompression at T7-8, and the lumbar MRI showed mild dessication at L3-4 without neurocompression.  (Tr. 263).  His impression was mid and low back pain, much improved tailbone pain, and headaches.  He recommended conservative treatment, and stated that claimant was okay to return to work.

On December 22, 2009, claimant reported that he had gone to work for two days, then his job sent him home.  (Tr. 262).  Dr. Heard recommended continued physical therapy.  He stated that claimant was okay to continue working.

On March 17, 2010, claimant walked with no limp and used no ambulatory aids.  (Tr. 259).  Motor exam was intact in the lower extremities.  Dr. Heard prescribed Zanaflex and Mobic.  He stated that claimant was okay to work.

On May 12, 2010, claimant continued to complain of pain. (Tr. 257). Dr. Heard recommended conservative treatment and an LESI series. (Tr. 254). He noted that claimant had not returned to work in spite of his release to return to work. (Tr. 257).

On August 30, 2010, claimant complained that his pain was constant and increased after excessive standing greater than 20 minutes. (Tr. 253). He used a cane. An MRI of the hips and pelvis dated August 4, 2010, were normal. (Tr. 253, 270). Dr. Heard recommended conservative treatment and another LESI. (Tr. 252-53).

On September 15, 2010, claimant reported that he had fallen at church the night before when his legs gave way. (Tr. 249). Dr. Heard's impression was headaches, mid-back pain, low back pain with radiculitis, and left hip trochanteric bursitis. He recommended another LESI.

On September 22, 2010, claimant was one day post-LESI without complications. (Tr. 248). He was using a cane. His motor exam was intact in the lower extremities.

Dr. Heard opined that claimant was approved for light and sedentary activities of daily living as tolerated, but was unable to work medium, heavy or very heavy work.

4

On October 13, 2010, claimant had about one week of relief from a left hip injection. (Tr. 247). He was able to do full toe touches from a standing position.

Dr. Heard's impression was headaches, mid-back pain with a small T7-8 bulge, low back pain with radiculitis with degenerative changes without neurocompression, and left hip pain. He stated that claimant was unable to work medium, heavy or very heavy work.

**(2) Consultative Examination by Dr. Barnabas Fote dated December 11, 2010**. Claimant complained of a back injury with bilateral leg numbness, left shoulder and left hip injury. (Tr. 276). He stated that he had had occupational therapy for about two and a half months which had helped. He reported that he used a cane all of the time. His medications included Tramadol, Tizanidine and Meloxicam.

Claimant reported that he accomplished half of his activities of daily living independently. He sometimes had to crawl out of the bathtub and needed assistance. He could dress himself, but sometimes lay on the bed to dress. He needed assistance with transferring from bed to a chair.

On upper extremity examination, claimant's grip and upper extremity strength was 5/5 bilaterally. (Tr. 277). Deep tendon reflexes were 2+ bilaterally. He could fully extend his hands, opposed his fingers, and make a fist bilaterally.

On lower extremity examination, claimant's deep tendon reflexes were normal at 2+ bilaterally.  His strength was 4/5 on the left and 5/5 on the right.  He had no joint swelling, edema, or ankle tenderness.

Neurologically, claimant's light touch sensation was intact.  He could not walk on his toes or heels, and could not squat.  Cranial nerves were grossly intact.

Dr. Fote's diagnoses were back, left hip, and left shoulder pain.  He opined that based on the musculoskeletal exam, claimant should be able to sit and stand, pull, push, kneel, crawl, and crouch as he could tolerate.  Additionally, Dr. Fote determined that claimant should be able to reach, grasp, handle and finger objects. He noted that claimant was using a cane and should continue.

**(3) Records from Dr. George Cousin dated September 26, 2011 to January 9, 2012**.  On September 26, 2011, claimant saw Dr. Cousin for his annual physical and lab work.  (Tr. 303-06).

Dr. Cousin completed a "check off" assessment on September 26, 2011, in which he checked "Yes" to all of the complaints on the list.  (Tr. 308).  In the remarks section, he wrote: "I have not performed a detailed neuro-muscular exam. I do his preventive health exams and see him for medical illnesses.  I believe that he says he experiences these problems."

6

On January 9, 2012, Dr. Cousin indicated that he had reviewed the form and concurred with the findings.  (Tr. 309).

**(4) Records from Dr. Heard dated November 16, 2010 to February 13, 2012**.  On November 16, 2010, claimant complained of headaches and constant pain in the tailbone, mid-back and low back radiating to the lower legs and ankles with tingling, numbness and aching.  (Tr. 326).  He walked with a cane.  Motor exam was intact in the lower extremities.

Dr. Heard's impression was headaches, mid-back pain with small T7-8 bulge, low back pain with radiculitis with degenerative changes without neurocompression or disc herniation, left hip pain, and chronic pain syndrome.  He prescribed Zanaflex, Mobic, and Ultram.  He recommended conservative treatment.

On December 14, 2010, claimant reported that he could sit up to 20 minutes in one position, then his pain increased.  (Tr. 324).  His motor exam was intact in the lower extremities.  He had some help with the LESI series.

Dr. Heard prescribed Zanaflex and Mobic.  He recommended conservative treatment.  He stated that claimant was approved for light and sedentary activities of daily living as tolerated, but was unable to work medium, heavy or very heavy work.

7

On January 11, 2011, claimant stated that he was never offered a light and sedentary job with his employer.  (Tr. 322).  He used a cane.  His motor exam was intact in the lower extremities.

Dr. Heard opined that claimant was approved for light and sedentary activities of daily living as tolerated, but was unable to work medium, heavy or very heavy work.  He had an estimated anatomical impairment rating of zero.

On February 28, 2011, claimant walked with a limp and used a cane.  (Tr. 320). His motor exam was intact in the lower extremities.  Dr. Heard recommended conservative treatment.  He opined that claimant was approved for light and sedentary activities of daily living as tolerated, but was unable to work medium, heavy or very heavy duty.

On March 3, 2011, claimant walked with no limp and used a cane.  (Tr. 319).  He could stand in one position for about one minute and sit in one position for about 20 minutes.  Dr. Heard prescribed Zanaflex, Mobic, Elavil and Ultram 50.

On April 25, 2011, claimant was motor intact in the lower extremities.  (Tr. 316).  He used a cane.  Dr. Heard stated that claimant was okay for light and sedentary activities as tolerated, but was unable to work medium, heavy or very heavy work.

8

On May 23, 2011, claimant walked with a cane and was wearing a corset. (Tr. 315).  He was intact in the lower extremities.  Dr. Heard recommended a self exercise program.  He stated that claimant was okay for light and sedentary activities as tolerated, but was unable to work medium, heavy or very heavy work.

On June 20, 2011, claimant walked with a cane.  (Tr. 314).  His motor exam was intact in the lower extremities.  He was approved for light and sedentary activities as tolerated, but was unable to work medium, heavy or very heavy work.

On August 1, 2011, Dr. Heard recommended conservative treatment.  (Tr. 313).  Claimant was approved for light and sedentary activities as tolerated, but was unable to work medium, heavy or very heavy work due to subjective complaints of pain.  Dr. Heard recommended an FCE.

On August 29, 2011, claimant reported that he could stand for about two hours, then the pain increased.  (Tr. 312).  He stated that he could sit for up to 20 minutes, then needed to change positions.  He used a cane.

Dr. Heard approved claimant for light and sedentary activities as tolerated, but not medium, heavy or very heavy work.  He stated that he was waiting on worker's compensation verification for the FCE.

On February 13, 2012, claimant reported that he could stand for 15 to 20 minutes, then the pain increased.  (Tr. 311).  He could sit in one position for 15 to

20 minutes.  He added a complaint of neck pain to the left upper/lower arm and wrist.  The motor exam was intact in the lower extremities.

Dr. Heard prescribed Zanaflex, Mobic and Esgic Plus.  He approved claimant for light and sedentary activities as tolerated, but not medium, heavy or very heavy work.  He stated that claimant was to return to his office on an as-needed basis.

On February 13, 2012, Dr. Heard completed the same check off list which Dr. Cousin had completed and checked "Yes" to all of the complaints on the list.  (Tr. 310).  He provided no explanation for his findings in the remarks section.

**(5) Claimant's Administrative Hearing Testimony**.  At the hearing on March 5, 2012, claimant testified that he had a bachelor's degree in general studies.  (Tr. 9).  He stated that he had done some training with the Workforce Commission.  He had last worked as a rehab technician at the sheriff's office from June to September of 2009.  Prior to that, he had worked as a special education teacher assistant, systems administrator and database specialist.  (Tr. 10-11).

Claimant reported that he had a work injury in September, 2009, in which he injured his left tailbone and hip.  (Tr. 14).  He testified that he had not had surgery for his broken tailbone because Dr. Heard said he was too young.  (Tr. 14-15).  He said that he had filed a worker's compensation claim.  (Tr. 27).

Regarding complaints, claimant stated that he was in and out with pain, and had drowsiness and fatigue. (Tr. 15). His medications included Amitriptyline, Tizanidine, Tramadol and Mobic.

Claimant testified that he used a cane to support his left side. (Tr. 16). He complained of left side problems, daily throbbing headaches, and shoulder spasms. (Tr. 16, 33, 37). He stated that his left leg gave out twice a day. (Tr. 19-20). He also complained that he slept sporadically. (Tr. 34).

Regarding activities, claimant testified that he did housekeeping once a week, drove by himself, did stretching daily, and made breakfast. (Tr. 19, 21). He also raised foster children. (Tr. 23).

As to limitations, claimant reported that he could lift no more than 20 to 25 pounds. (Tr. 23). He said that Dr. Heard had written a letter stating that he could not lift more than 25 pounds and could do only sedentary work. (Tr. 28).

At the conclusion of the hearing, the ALJ stated that because of the inconsistency in the treating physician records, she was going to send out a medical source statement to Dr. Heard or send claimant for another consultative exam. (Tr. 29-31, 48).

**(6) Administrative Hearing Testimony of Thomas Lafosse, Vocational Expert ("VE")**. Mr. Lafosse classified claimant's past work as a systems

11

administrator as sedentary and skilled; teacher assistant as light and skilled; computer programmer as sedentary and skilled, and psychology tech as medium with a Specific Vocational Preparation ("SVP") of 4. (Tr. 35-36). He testified that claimant had transferable skills to credit reporting clerk, which was sedentary with an SVP of 4; data entry clerk, which was sedentary with an SVP of 4; terminal makeup operator, printing and publications, which was sedentary with an SVP of 5; digitized operator, business service and petroleum and gas, which was sedentary with an SVP of 5, and correspondent school instructor, which was sedentary with an SVP of 7. (Tr. 38-39).

The ALJ asked the VE to assume a claimant of the same age, background and work experience; who could do sedentary or light work, but was unable to climb ropes, ladders, or scaffolds; could only occasionally climb ramps and stairs; could not stoop or crouch; had to avoid unprotected heights and dangerous moving machinery; required a cane for ambulating prolonged distances or uneven surfaces; could frequently use foot pedals bilaterally, and was limited as to frequent use of the hands for handling, fingering, and feeling. (Tr. 39-40). In response, the VE testified that claimant could do his past work as an administrative assistant and computer programmer. (Tr. 40).

When the ALJ modified the hypothetical to add an at-will sit/stand option, Mr. Lafosse stated that it would not have an impact on those jobs.  The ALJ then asked whether any work would be available for a claimant who could use his hands only occasionally for keyboarding and writing.  (Tr. 41).  In response, the VE testified that he could not do any past relevant work, but could work as a contract representative, of which there were 43,300 jobs nationally and 683 statewide.  (Tr. 41-42, 45).

When the ALJ asked whether that person's ability to do work would be affected if he needed to take additional work breaks of 15 to 30 minutes twice a day up to three times a week, Mr. Lafosse answered that such extra breaks would not be allowed in the private sector.  (Tr. 43-45, 48).

**(7) The ALJ's Findings.**  Claimant argues that: (1) the ALJ erred in relying on Dr. Heard's opinion while discounting his medical source statement; (2) the ALJ erred in overlooking the clarifying opinion of Dr. Cousin, and (3) the ALJ erred in failing to recontact Dr. Heard.

Regarding the first argument, it is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237

13

(5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455.

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Id.* at 456; *Greenspan*, 38 F.3d at 237.

Here, claimant argues that the ALJ erred in relying on Dr. Heard's opinion that he could do light or sedentary work while discounting his medical source statement indicating that he could not do any work.

In *Newton*, the Fifth Circuit set forth the factors to be considered before declining to give the treating physician's opinion controlling weight.  Specifically, 20 C.F.R. § 404.1527(c) requires consideration of: (1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the

14

opinion with the record as a whole; and (6) the specialization of the treating physician. *Id*. at 456.

This regulation is construed in SSR 96-2p, which states:

[A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Here, the record reflects that the ALJ specifically considered the factors for weighing the treating physician's opinion, including Dr. Heard's specialty in orthopedics; his greater longitudinal perspective of claimant's condition; the support of his opinion with the other medical evidence of record, and the consistency of his opinions with the other medical records. (Tr. 81-82). Based on the evidence as a whole, including the objective testing, consultative examination, and treating physicians' reports, she assigned greatest weight to Dr. Heard's opinion that claimant could perform work at the sedentary to light exertional level. (Tr. 81-82).

15

Additionally, the ALJ found that claimant's description of his symptoms was only partially credible.  (Tr. 80).  She noted that claimant had received treatments for his pain complaints and migraines, which had been essentially conservative in nature.  She also cited the fact that there was no medical evidence that claimant had persistent and adverse side effects from medication, resulting in significant limitations in his functional capacity, or which were incapable of being controlled by medication adjustments or changes.  If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Further, the ALJ cited a lack of medical evidence showing a significant degree of muscle atrophy, decreased range of motion, spasms, sensory or motor loss, reflex abnormality, high-grade stenosis, fracture, or spondylolisthesis.  As to his migraine complaints, the ALJ noted that he had not required aggressive treatment or frequent hospitalization, nor had he been referred for any outside treatment or testing.  It is well established that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability.  *Villa v.* Moreover, the ALJ observed that despite claimant's complaints of continued pain and migraines, he was able to dress himself, prepare simple meals, drive, and do

16

simple household chores such as ironing, mopping, sweeping, and doing small loads of laundry.  (Tr. 80, 212).  Additionally, he paid his bills and handled his finances, and spent his day stretching, watching television, reading, writing, researching, designing art, and meditating.  (Tr. 213-15).  He also visited with others, attended church twice a week, shopped, and went to the library.  It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status.  *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  As the ALJ's decision is supported by the evidence, it is entitled to deference.

Next, claimant argues that the ALJ improperly discounted the medical source statement of claimant's treating physician, Dr. Cousin.  The ALJ noted that Dr. Cousin had executed the same "check off" assessment in September, 2011, in which he essentially agreed point-by-point with Dr. Heard's findings.  (Tr. 81, 308-09).  She found that Dr. Cousin did not describe a medically determinable impairment which could reasonably cause claimant's alleged limitations, and provided no clinical signs in support of his conclusions.

Additionally, the ALJ found that Dr. Cousin's statements appeared to be based solely on claimant's subjective statements, particularly Dr. Cousin's acknowledgment  that "I believe that *he says* he experiences these problems." (emphasis added).  (Tr. 308).  In fact, Dr. Cousin wrote that "I have not performed

17

a detailed neuro-muscular exam.  I do his preventive health exams and see him for medical illnesses."

Further, the ALJ noted that Dr. Cousin did not provide much treatment, as the record contained only one visit for an "annual" and "labs." (Tr. 303-07).  She also observed that although Dr. Cousin indicated that claimant was unable to bend, his physical examination revealed no abnormalities.  Thus, she gave his "pessimistic" functional assessment little weight.

In summary, the ALJ rejected Dr. Cousin's opinion because it was conclusory and unsupported by any documented evidence.  (Tr. 81).  It is well established that "the ALJ has *sole* responsibility for determining a claimant's disability status."  (emphasis added).  *Newton*, 209 F.3d at 455 (*citing Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)).  Further, the ALJ is free to reject the opinion of any expert when the evidence supports a contrary conclusion.  *Id*.  As Dr. Cousin's check-off assessment was conclusory and unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, the ALJ had good cause to discount his opinion.  *Newton*, 209 F.3d at 456.

Finally, claimant argues that the ALJ was required to recontact Dr. Heard regarding the inconsistencies in his opinions.  [rec. doc. 12, p. 8].  The ALJ recognized that Dr. Heard's reports were inconsistent.  (Tr. 81).  She noted that at

18

Dr. Heard's last examination on February 13, 2012, he indicated that claimant could work at the sedentary to light exertional level; however, on the same day, he executed a "check-off" assessment indicating that claimant experienced every symptom on the list, which would necessarily preclude his employment.

Prior to 2012, the regulation containing the subsection on recontacting medical sources provided as follows:

> (e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.

20 C.F.R. § 404.1512(e) (emphasis added).

Effective in March 2012, the regulation containing the subsection on recontacting medical sources was amended to eliminate this requirement.  77 FR 10651-01, 2011 WL 7404303 (F.R. Feb. 23, 2012).  The purpose of the change was to give adjudicators more flexibility in determining how to best obtain information, with the goal of making disability determinations more quickly and efficiently. 77 FR 10651-01, 2011 WL 7404303 (F.R. Feb. 23, 2012).  *Bumgardner v. Astrue*, 2013 WL 2147201, *5 n. 7 (M.D. La. Apr. 11, 2013), *report and recommendation adopted*, 2013 WL 2147243 (M.D. La. May 15, 2013).

19

A similar argument was raised in *Andre v. Astrue*, 2012 WL 5363321 (M.D.

La. Sept. 24, 2012), *report and recommendation adopted*, 2012 WL 5363317

(M.D. La. Oct. 30, 2012).  There, plaintiff implied that because of an apparent

conflict between his earnings record and the statements of his treating physician,

Dr. McLemore, the ALJ should have recontacted Dr. McLemore pursuant to 20

C.F.R. § 404.1512(e).  Citing 77 FR 10651-01, the court disagreed, reasoning as

follows:

> The ALJ is only required to develop the record further by contacting a
> treating physician, when their evidence is inadequate to determine
> whether the claimant is disabled, and there is insufficient objective
> and opinion evidence in the record from treating and other sources.
> Furthermore, even if the ALJ erred by not recontacting Dr. McLemore,
> the plaintiff did not offer anything to establish that he was prejudiced
> by this alleged error. He offered no argument or evidence that
> additional information or records from Dr. McLemore would have had
> an effect on the decision or that such information or records even
> exist. *See, Jones v. Astrue*, 691 F.3d 730, 2012 WL 3553622 (5th Cir.
> Aug. 20, 2012) [*cert. denied*, 133 S. Ct. 953, 184 L. Ed. 2d 728
> (2013)].

Id. at *4 n. 13.[1]

Here, claimant has not shown that he was prejudiced by the ALJ's failure to

recontact Dr. Heard.  Prejudice can be established by showing that additional

evidence would have been produced if the ALJ had fully developed the record, and

---

[1]Although not bound by unpublished opinions, the Court finds this reasoning persuasive.

that the additional evidence might have led to a different decision. *Newton*, 209 F.3d at 458 *Id*.

In this case, the ALJ failed to give much weight to the "yes or no" check off assessment, as Dr. Heard failed to describe a medically determinable impairment that could reasonably cause such limitations, and provided no clinical signs in support of his conclusions. (Tr. 81). Instead, she assigned greatest weight to Dr. Heard's opinion that claimant could perform work at the sedentary to light exertional level, using the factors at 20 C.F.R. §§ 404.1527(d) and 416.927.

In addition, the ALJ noted that objective testing had shown no disc protrusion, spinal stenosis or impingement on the neural foramina, and no hip abnormalities. (Tr. 82, 247). Further, on consultative examination, he had full range of motion of the cervical and lumbar spine and extremities and no neurological, sensory, or motor deficits. (Tr. 277). Moreover, she observed that Dr. Heard's reports showed that claimant's motor exams had been intact and grip strength was 5/5 with the ability to fully extend his hands, fully oppose his fingers, and make a fist bilaterally. (Tr. 82, 247-72, 311-26). Because the record contained ample objective and opinion evidence supporting the ALJ's conclusions, she was not required to develop the record further by recontacting Dr. Heard. *Jones*, 691 F.3d at 733. This, this argument lacks merit.

21

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN  (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION***, 79 F.3D**

**1415 (5TH CIR. 1996).**

Signed August 14, 2014, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RFD
On:  8/15/2014
By:  MBD

23